## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALFRED T. GIULIANO, as Chapter 7 Trustee for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and, DSI Facility Development, LLC,**<br><br>    **Plaintiff,**<br>**v.**<br><br>**CDSI I HOLDING COMPANY, INC., CDSI II HOLDING COMPANY, INC., MICHAEL SCHNABEL, BRUCE POLLACK, LEIF MURPHY, ROBERT BERGMANN, KEN KENCEL, JAY YALOWITZ, CENTRE PARTNERS MANAGEMENT LLC, CENTRE BREGAL PARTNERS, L.P., CENTRE CAPITAL INVESTORS IV, L.P., CENTRE CAPITAL NON-QUALIFIED INVESTORS IV, L.P., CENTRE PARTNERS COINVESTMENT IV, L.P., CENTRE PARTNERS IV L.P., CENTRE PARTNERS IV LLC, CENTRE PARTNERS COINVESTMENT V, L.P., CENTRE CAPITAL INVESTORS V, L.P., CENTRE CAPITAL NON-QUALIFIED INVESTORS V, L.P., CENTRE BREGAL PARTNERS II, L.P., CENTRE PARTNERS V L.P., CENTRE PARTNERS V LLC, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY FOR ITS GROUP ANNUITY SEPARATE ACCOUNT, APOLLO INVESTMENT CORPORATION, and, ARES CAPITAL CORPORATION,**<br><br>    **Defendants.** | **CIVIL ACTION NO. ____**<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

## I.    INTRODUCTION

1.      Plaintiff Alfred T. Giuliano, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings LLC, DSI Hospitals, Inc., and DSI Facility Development, LLC (collectively, the 'Debtors"), by and through his counsel, brings this action, *inter alia*: (a) to avoid as fraudulent transfers various transactions, transfers and agreements executed and implemented in connection with (i) the January 11, 2010 global restructuring (the "DSI Restructuring") of the Debtors and their affiliates, including operating subsidiary DSI Renal, Inc. ("DSI Renal"),[1] and, (ii) the February 2011 sale of DSI Renal to DaVita, Inc. ("DaVita") for more than $700 million (the "DaVita Merger Transaction"); and (b) to recover in excess of $425 million from the Defendants who include transferees of the fraudulent transfers, officers, directors and/or controlling shareholders who orchestrated, implemented and profited from the wrongdoing alleged herein, and aiders and abetters of the wrongdoing of others.

2.      In short, the DSI Restructuring was part of an unlawful scheme to strip out substantially all of the assets of Debtor DSI Renal Holdings LLC for the benefit of the Debtors' largest shareholders and largest insider creditors and to shield the Debtors' assets from the claims of more than 200 of the Debtors' outside creditors that the insiders wished to avoid.

---

[1]      DSI Renal was the most valuable of the Debtors' companies.  It was that entity which owned and operated more than 100 outpatient dialysis clinics and provided services to acute care facilities.

2

II.     **JURISDICTION AND VENUE**

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 (the Bankruptcy Code), or in or related to cases under Title 11.

4.      The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(c).

III.    **PARTIES**

**The Plaintiff**

6.      Plaintiff Alfred T. Giuliano is the Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of Debtors DSI Renal Holdings LLC ("DSI Renal Holdings"), DSI Hospitals, Inc. ("DSI Hospitals"), and, DSI Facility Development, LLC ("DSI Facility"), which on June 3, 2011 (the "Petition Date"), filed voluntary petitions for relief under Chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, with the cases being jointly administered under the caption, *In re DSI Renal Holdings LLC, et al.* U.S.B.C. D. Del., Case No. 11-11722 (KJC).

7.      On the Petition Date: DSI Renal Holdings was a Delaware limited liability company; DSI Hospitals was a Delaware corporation; and, DSI Facility was a Delaware limited liability company.  Prior to the Petition Date – and in connection with the DSI Restructuring described in detail *infra* – the Debtors' ultimate parent, DSI Holding Company, Inc. ("DSI

3

Holding Company"), a Delaware corporation, was merged into Debtor DSI Renal Holdings, with

DSI Renal Holdings as the surviving company.

## The Defendants

### The New Holding Company Defendants

8.      Defendant CDSI I Holding Company, Inc. ("CDSI I") is a Delaware corporation

with a registered office for service of process at 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808.  CDSI I was formed on or about December 29, 2009 for the purpose of

effectuating the DSI Restructuring and the fraudulent transfers that occurred in connection

therewith.  At all times material hereto: Defendant Murphy was the President and Chief

Executive Officer of CDSI I; Defendant Yalowitz was the Secretary of CDSI I; and, Defendants

Murphy, Schnabel and Pollack were members of the board of directors of CDSI I.

9.      Defendant CDSI II Holding Company, Inc. ("CDSI II")  is a Delaware corporation

with a registered office for service of process at 2711 Centerville Road, Suite 400, Wilmington,

Delaware 19808.  CDSI II was formed on or about December 29, 2009 for the purpose of

effectuating the DSI Restructuring and the fraudulent transfers that occurred in connection

therewith.  At all times material hereto: Defendant Murphy was the President and Chief

Executive Officer of CDSI II; Defendant Yalowitz was the Secretary of CDSI II; and, Defendants

Murphy, Schnabel and Pollack were members of the board of directors of CDSI II.

### The Director and Officer Defendants

10.      Defendant Michael Schnabel ("Schnabel") is an individual with a place of

business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, Defendant

Schnabel was an insider of the Centre Partners Defendants, a director of DSI Holding Company

4

(i.e., the transferor of the fraudulent transfers effectuated through the DSI Restructuring), a director of Debtor DSI Hospitals and a director of DSI Renal.

11.    Defendant Bruce Pollack ("Pollack") is an individual with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, Defendant Pollack was an insider of the Centre Partners Defendants, a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

12.    Defendant Leif Murphy ("Murphy") is an individual who resides at 4909 Maymanor Circle, Nashville, TN 37205.  At all times material hereto, Murphy was a director and the president of DSI Holding Company, Debtor DSI Hospitals, and DSI Renal.

13.    Defendant Robert Bergmann ("Bergmann") is an individual who resides at 13600 Romany Drive, Pacific Palisades, CA 90272.  At times material hereto, Defendant Bergmann was a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

14.    Defendant Ken Kencel ("Kencel") is an individual who resides at 190 North Street, Greenwich, CT 06830.  At times material hereto, Defendant Kencel was a director of DSI Holding Company, a director of Debtor DSI Hospitals, and a director of DSI Renal.

15.    Defendant Jay Yalowitz ("Yalowitz") is an individual who resides at 1700 Stokes Lane, Nashville, TN 37215.  At all times material hereto, Defendant Yalowitz was the secretary and general counsel of DSI Holding Company, the secretary of Debtor DSI Hospitals, and the secretary of DSI Renal.  Defendants Schnabel, Pollack, Murphy, Bergmann, Kencel and Yalowitz are referred to collectively in this Complaint as the "Director and Officer Defendants."

16.    At all times material hereto, the Debtors had no "independent" directors.

5

### The Centre Partners Defendants

17.     Defendant Centre Partners Management LLC ("CPM") is a limited liability company and private equity firm with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPM managed the Centre Partners affiliates' investments in the Debtor.

18.      Defendant Centre Bregal Partners, L.P. ("CBP") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CBP was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

19.     Defendant Centre Capital Investors IV, L.P. ("CCI IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCI IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

20.     Defendant Centre Capital Non-Qualified Investors IV, L.P. ("CCNQ IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCNQ IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

21.     Defendant Centre Partners Coinvestment IV, L.P. ("CPCI IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPCI IV was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

22.     Defendant Center Partners IV L.P. ("CP IV") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CP IV was the general partner of CBP, CCI IV, CCNQ IV, and CPCI IV.

23.     Defendant Centre Partners IV LLC ("CP IV LLC") is a limited liability company with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP IV LLC was the general partner of Defendant CP IV and Defendant Bruce Pollack was the managing partner of CP IV LLC.

24.     Defendant Centre Partners Coinvestment V, L.P. ("CPCI V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CPCI V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

25.     Defendant Centre Capital Investors V, L.P. ("CCI V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCI V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

26.     Defendant Centre Capital Non-Qualified Investors V, L.P. ("CCNQ V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto, CCNQ V was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

27.     Defendant Centre Bregal Partners II, L.P. ("CBP II") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.   At all times material hereto,

CBP II was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

28.     Defendant Centre Partners V L.P. ("CP V") is a limited partnership with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP V was the general partner of CPCI V, CCI V, CCNQ V, and CBP II.

29.     Defendant Centre Partners V LLC  ("CP V LLC") is a limited liability company with a place of business at 825 Third Avenue, New York, NY 10022.  At all times material hereto, CP V LLC was the general partner of Defendant CP V and Defendant Bruce Pollack was the managing partner of CP V LLC.   Defendants CPM, CBP, CCI IV, CCNQ IV, CPCI IV, CP IV, CP IV LLC, CPCI V, CCI V, CCNQ V, CBP II, CP V, and CP V LLC are referred to collectively in this Complaint as the "Centre Partners Defendants."

30.     At all times material hereto, the Centre Partner Defendants were controlling shareholders/owners of the DSI Holding Company and the Debtors, controlling four of the five seats on the boards of directors.

**The Northwestern Mutual Life Defendants**

31.     Defendant The Northwestern Mutual Life Insurance Company ("NML") is a Wisconsin corporation with a place of business at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.  At all times material hereto, NML was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

32.     Defendant The Northwestern Mutual Life Insurance Company For Its Group Annuity Separate Account ("NML GA") is a Wisconsin corporation with a place of business at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.  At all times material hereto, NML

8

GA was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.  Defendants NML and NML GA are referred to collectively in this Complaint as the "Northwestern Mutual Life Defendants."

### Other Defendants

33.     Defendant Apollo Investment Corporation ("Apollo") is a Maryland corporation with a place of business at 9 West 57th Street, New York, NY 10019.  At all times material hereto, Apollo was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

34.     Defendant Ares Capital Corporation ("Ares") is a Maryland corporation with a place of business at 245 Park Avenue, 44th Floor, New York, NY 10167.  At all times material hereto, Ares was a shareholder of Defendant CDSI I and a transferee of the fraudulent transfers identified herein.

## IV.    FACTS

35.     The Debtors are the empty shells of a healthcare conglomerate that once comprised more than 25 companies.

36.     Through its operating subsidiaries – and in particular operating subsidiary DSI Renal – Debtor DSI Renal Holdings LLC was the fifth largest provider of outpatient dialysis clinics in the United States, owning and operating 106 clinics and providing services to 26 acute care facilities.  As of October 31, 2009, the Debtors' clinics treated approximately 7,800 patients in 23 states and generated annual revenues of approximately $350 million.

37.     For the year ending December 31, 2008, however, the Debtors – who at all times material hereto had filed consolidated tax returns – suffered a write-down of more than $100 million in the value of accounts receivable.

38.     In or around October, 2008, Defendant Murphy was hired to replace the then CEO – who was deemed responsible for the financial missteps that had caused the write-down – and to implement a turnaround plan.

39.     One of the Debtors' operating subsidiaries – Bucks County Oncoplastic Institute LLC (the "Bucks County Hospital" or "Bucks County") – owned a specialty breast cancer treatment institute in Bucks County, Pennsylvania.

40.     The Bucks County Hospital was never profitable or cashflow positive.  Rather, it incurred tens of millions of dollars of losses from its inception through its closing.

41.     Shortly after he was hired, Defendant Murphy recommended the closure of the Bucks County Hospital.

42.     When it shut down on or around February 4, 2009, the Bucks County Hospital owed almost forty million dollars to more than 200 creditors – many of whom reside in the Eastern District of Pennsylvania.

43.     At all times material hereto, Debtor DSI Renal Holdings/DSI Holding Company was liable for the debts of its operating subsidiary the Bucks County Hospital because, among other reasons: (a) the Debtor had guaranteed Bucks County Hospital debt; (b) from 2005 when the Bucks County Hospital was being developed, through early 2009, when it was being shut down, the thousands of purchase orders issued to vendors who provided goods and services to the Bucks County Hospital were issued not by the Bucks County Hospital, but by and under the

10

name of Debtor DSI Renal Holdings/DSI Holding Company;[2] (c) the Bucks County Hospital's bills were routinely paid by Debtor DSI Renal Holdings/DSI Holding Company and affiliate DSI Renal; (d) the Debtors' personnel had controlled the Bucks County Hospital; (e) the Bucks County Hospital's funds were co-mingled with funds of the Debtor and its affiliates; and, (f) corporate distinctions were not observed as between the ultimate parent, i.e., the Debtors and their operating subsidiary, i.e., the Bucks County Hospital, rendering the Debtors liable as the alter ego of the Bucks County Hospital and the Debtors' other affiliates.

44.     Based on the Trustee's review of the books and records of the Debtors and their subsidiaries, the companies were operated as a single entity, with millions of dollars having been routinely transferred between and among the companies to fund the cash needs of the day, without regard to which company generated the cash or which company incurred the expense being paid.  As confirmed by an email dated April 1, 2010, neither the treasurer nor any other company employee was able to explain the "major swings" in intercompany transfers.

45.     On or about November 10, 2008, the Board of Directors of Debtor DSI Hospitals authorized the closure of the Bucks County Hospital and the commencement of bankruptcy proceedings on behalf of the Bucks County Hospital depending on the success of negotiations with creditor MPT of Bucks County, LP ("MPT"), a secured creditor of the Bucks County Hospital, whose debt was in part guaranteed by Debtor DSI Renal Holdings/DSI Holding Company.

---

[2]     An April 1, 2010 email from the Bucks County Hospital's bankruptcy counsel to Yalowitz confirms the point: "On our call today I understood you to say that the procurement system was set up such that every PO was designated "Bill to Holdco" (regardless of whether it was a Renal or Hospital purchase.)"

46.     The negotiations with MPT proved unsuccessful and the Bucks County Hospital was closed.

## The Tennessee Bankruptcy Case

47.     In the first part of the unlawful scheme to avoid liability for the debts of the Bucks County Hospital, the Debtors' management/directors caused the Bucks County Hospital to commence a Chapter 7 bankruptcy case in Tennessee on March 30, 2009, captioned, *In re Bucks County Oncoplastic Institute, LLC, Debtor*, U.S.B.C. M.D. Tenn., Case No. 3:09-bk-03570 (the "Tennessee Bankruptcy Case").

48.     As reflected on the schedules filed by the debtor in the Tennessee Bankruptcy Case, which were verified by Defendant Yalowitz, the Bucks County Hospital owed in excess of $36 million to more than 200 creditors who resided in and/or who provided goods/services to the Bucks County Hospital in the Eastern District of Pennsylvania.

49.     The bankruptcy schedules filed in the Tennessee Bankruptcy Case were materially false, and that material falsity was intentional.

50.     In numerous *internal* documents, DSI Holding Company (which merged into Debtor DSI Renal Holdings in connection with the DSI Restructuring) admitted its liability to numerous creditors of the Bucks County Hospital, yet, in most instances, the Debtor's status as "codebtor" for the Bucks County Hospital was omitted from the schedules and the Tennessee Bankruptcy Case was closed without that status ever having been revealed.

51.     By omitting DSI Holding Company as a codebtor, company insiders diminished the likelihood that the Bucks County Hospital's creditors would commence litigation or take other action, such as the commencement of an involuntary bankruptcy proceeding against DSI

12

Holding Company, which would have torpedoed the contemplated restructuring and other

transactions.

52.     An email dated September 25, 2009, from Defendant Yalowitz (the company's

former general counsel) to Defendant Murphy (the company's former CEO) establishes the point:

> FYI. The Trustee [in the Tennessee Bankruptcy Case] has filed
> suit against DSI Holding Company seeking recovery of $90,000 in
> management fees that we received ....  In light of what may likely
> occur with DSI Holding Company I am going to slow walk this and
> try to drag it out as long as possible.

53.     Similarly, a November 23, 2009 email from the Bucks County Hospital's

bankruptcy counsel to Defendant Yalowitz supports the point, and raises serious concerns about

the lack of candor in that bankruptcy proceeding:

> Good news: the court simply scheduled another pretrial for
> February 1 to give the parties time to try to resolve this matter
> informally.  Not so good news: while the court had no problem
> with our representing DSI [in the defense of preference litigation
> brought by the Bucks County Chapter 7 Trustee] after having
> represented Bucks County, she asked that we notify all Bucks
> County creditors of our joint representation and give them an
> opportunity to object.  **I'm thinking maybe we should wait a few
> weeks before sending that notice in order to see what happens
> at the DSI level, because I don't want such a notice to give any
> more creditors the idea that they can/should sue DSI for Bucks
> County debt on the theory that they are the same entity**.
> (Emphasis added).

54.     Eventually, the bankruptcy trustee in the Tennessee Bankruptcy Case distributed

only $215,000 or so to around forty creditors on account of the initially scheduled claims which

had exceeded $36 million.

55.     On or about January 11, 2013 – as a result of the wrongdoing uncovered and

identified by the Trustee/Plaintiff – the United States Trustee for the Middle District of

Tennessee filed a motion to reopen the Tennessee Bankruptcy Case.

56.     On February 6, 2013, the Tennessee Bankruptcy Court granted the motion and

reopened the Tennessee Bankruptcy Case.

### The Stabilization of the Renal Business

57.     Promptly after taking over the management of the Debtors, Defendant Murphy

identified and implemented revenue enhancement opportunities (in the form of increased

insurance reimbursement from third-party payers), and expense reduction opportunities, the

combined effect of which effectuated a dramatic turnaround of the Debtors' business and

finances.

58.     In fact, as the Defendants were well-aware, the Debtors' turnaround plan was well

on its way to success by June, 2009, with the company having experienced two consecutive

quarters of improved financial operations and better than projected revenues and earnings.

59.     Shortly after the turn-around plan had been implemented, management projected –

and the Officer and Director Defendants expected – that operational and financial performance

would continue to improve through the end of the year and beyond, with 2009 earnings then

projected at between $56 - $61 million.

14

**The Insider Defendants Conducted a Half-hearted Sale Process as Cover
for Their Unlawful Scheme to Strip Out Substantially all of the Assets of
Debtor DSI Renal Holdings LLC for the Benefit of the Defendants**

60.    As part of a ruse to appease the lenders and to establish a suppressed "restructure

valuation" to the detriment of certain shareholders and all of the Debtors' non-insider creditors,

the Debtor engaged Goldman Sachs to solicit outside interest in acquiring the companies.

61.    On or before June, 4, 2009 – before the first outside bid had been received – the

Debtor had engaged outside counsel to effectuate a restructuring.

62.    In reality, the sale effort was designed and effectuated to suppress outside investor

interest, in a effort to afford the Centre Partners Defendants and the Northwestern Mutual Life

Defendants the opportunity to wipe out the Debtor's ownership of and to acquire for themselves

a majority interest in DSI Renal.

63.    Indeed, when DaVita made an offer to purchase the Debtor's DSI Renal business

on August 5, 2009, Defendant Murphy commented, "This just in. Pathetic offer – I couldn't be

happier!"

64.    The Goldman Sachs sale process resulted in several low-ball offers because they

were based on limited financial information from the pre-turnaround period, rather than on the

improved revenues and earnings that the Debtors were then experiencing and which were

projected by company insiders to continue and improve over the next year.

65.    As admitted in an internal memorandum of the Northwestern Mutual Life

Defendants dated September 17, 2009, "The business suffered a material setback in 2008 due to

operational mis-steps by the prior CEO.  A strong turnaround is underway." (emphasis in

original).

66.     Although the Centre Partners Defendants and the Northwestern Mutual Life Defendants determined that the offers obtained in the initial phase of the Goldman Sachs sale process had "failed to produce fair value" for the Debtor, the Director and Officer Defendants prematurely terminated the sale process at the direction of the Centre Partners Defendants.

67.     As the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and perhaps other Defendants were aware, had the Debtor deferred the sale process until the end of the year or into the next, the valuations of interested outsiders would have been based on the company's rapidly improving, current financial results, and the interest and arms-length offers of outsiders would have increased dramatically.

68.     In fact, DaVita, who ultimately purchased the restructured company for more than $700 million, expressed a willingness to increase its offer in the fall of 2009, yet was completely rebuffed.

69.     Motivated by a desire to effectuate certain insiders' ability to "purchase" the company at a distressed/lowball value – rather than at a price consistent with their fiduciary duty to maximize value for the benefit of all company shareholders and creditors – the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and perhaps other Defendants successfully pushed to accelerate and close the DSI Restructuring.

70.     While the low-ball offers from outsiders were properly rejected, they were then improperly used by the Director and Officer Defendants, the Centre Partners Defendants, the Northwestern Mutual Life Defendants and other Defendants as cover to justify the low-ball valuation upon which the DSI Restructuring was based.

**The Insider Defendants Effectuated the Fraudulent Transfer of DSI Renal Through the DSI Restructuring and the Subsequent Sale to DaVita – all to the Substantial Detriment of the Debtors' Non-insider Creditors.**

71.     At a joint meeting of the board of directors of DSI Holding Company and DSI Renal held on September 14, 2009, the Director Defendants voted to terminate the Goldman Sachs sale process, to not provide any additional information to bidders, and to, instead, pursue a restructuring of the company.

72.     At a joint meeting of the board of directors of DSI Holding Company and DSI Renal held on January 6, 2010, the Director Defendants approved the DSI Restructuring.

73.     The DSI Restructuring, which closed on January 11, 2010, was part of an unlawful scheme to strip out substantially all of the assets of the Debtor for the benefit of the Company's largest shareholders and largest insider creditors – including the Centre Partners Defendants, the Northwestern Mutual Life Defendants, Ares and Apollo – and to shield the Debtors' assets from the claims of the many outside creditors that the insiders wished to avoid.

74.     Developed by the Centre Partners Defendants – who at the time owned 46% of the stock of Debtor DSI Renal Holdings/DSI Holding Company and controlled a majority of the boards of the Debtors and their subsidiaries – the scheme involved:

(a)     the formation of two new holding companies – i.e., Defendants CDSI I and CDSI II – approximately 90% of whose stock was issued to the Debtor's largest shareholders (i.e., the Centre Partners Defendants who were issued 49.1% of the stock, the Northwestern Mutual Life Defendants who were issued 19.8% of the stock, Ares who was issued 14.3% of the stock, and

Apollo who was issued 6.7% of the stock), while 10% of the stock was issued to the Debtor's other shareholders;[3] and,

    (b)    the transfers by Debtor DSI Renal Holdings/DSI Holding Company of: (i) the Debtor's 100% ownership interest in DSI Renal; (ii) $250 million of net operating loss carry forwards; (iii) the Debtor's management contracts and upper-management team; and, (iv) fixed assets (e.g., desks, computers, furniture, etc.) and certain receivables.  In return for these transfers, the Debtor received one share of stock in CDSI I, an insignificant amount of cash and relief from certain liabilities to insiders with the ability to interfere with the proposed transaction (and who had expressed an intention to do so).

    75.    As part of their fraudulent effort to wipe out the Debtors' equity interest in DSI Renal and to avoid obligations to the Debtors' non-insider creditors, the Defendants had placed a low-ball value on the restructured company of $477.7 million, when in fact the fair market value of the company as of the date of the DSI Restructuring exceeded $650 million and was increasing each day.

    76.    When questioned under oath as to how the restructured value had been determined, Defendant Schnabel admitted that it was not based on an appraisal or outside

---

[3]    Among the common shareholders of DSI Holding Company were approximately thirty individuals/entities who received nominal shares in CDSI I.  These shareholders played no active role in the DSI Restructuring and many were either unaware of it in real time or were erroneously told by Defendant Murphy and others that their DSI Holding Company equity was worthless.  To the extent these shareholders received payment for their shares of CDSI I as a result of the DaVita Merger Transaction, they received substantially less than they would have received had the wrongdoing alleged herein not occurred.  To the extent that these shareholders were unaware of the Defendants' wrongdoing, they were themselves victims of the Defendants' fraudulent schemes.  The damages to innocent shareholders have yet to be fully ascertained but likely exceed $10 million.

opinion as to the fair market value of the business, but, rather, was based solely on the debt

associated with the continued operation of the DSI Renal business and the restructuring

transaction costs.

77.     In this regard, Defendant Schnabel testified:

Q.     So, the ... restructuring value for purposes of moving forward was
determined by the amount that would be required to pay the debt of the Renal
Business and the transaction costs [?]

A.     Correct.

78.     In fact, a September 30, 2009 pre-restructuring internal valuation of the Centre

Partners Defendants had valued the restructured company at approximately $562 million, $30

million dollars greater than a similar internal valuation just three months earlier, and an amount

sufficient to have paid the Debtors' creditors in full.

79.     When the company's former CEO and one of its consulting surgeons expressed

the view that the company was worth $632 million and threatened to derail the DSI

Restructuring, the Director and Officer Defendants caused them to receive consideration worth

approximately two million dollars, in return for their "cooperation" with the restructuring

transaction.

80.     As a result of the DSI Restructuring, the Debtor went from owning 100% of the

stock of DSI Renal, to owning less than one-thousandth of a percent of the stock of CDSI I, i.e., 1

share out of a total of 138,154.275 shares.

81.     In an effort to "persuade" the other shareholders to refrain from interfering or

challenging the DSI Restructuring, all of the former shareholders of the Debtor were granted

shares of CDSI I – albeit diluted from their share ownership in the Debtor – without such